Oh, yay. Oh, yay. Oh, yay. The Honorable Appellate Court, 5th District, State of Illinois is now in session. The Honorable Justice Bowie presiding along with Justice Cates and Justice Barberis. The first case this morning is number 519-0108, Enri Harlin H. Arguing for the appellant, Harlin H., is Laurel Spahn. Arguing for the appellee, people of the State of Illinois, Sharon Shanahan. Each side will have up to 15 minutes for their argument. The appellant will have five minutes for rebuttal. You see the digital timekeeping device, and when time has expired, I'll hit the gavel. Please remember only the clerk can record these proceedings. Good morning, counsel. How's everybody? Good morning. Ms. Spahn, you ready to proceed? Yes. Then go right ahead. Okay. Good morning, everyone. May it please the court, I'm Laurel Spahn, and I'm with the Legal Advocacy Service of the Illinois Guardianship and Advocacy Commission, and our office was appointed as counsel on appeal for the appellant, Harlin H. Just as a road map for my portion of the argument this morning, I'd like to cover two particular things this morning, and I'd like to start by just noting that the state did confess error on an issue in this appeal and in the companion Leo M. appeal, and that was the issue of the failure to specify dosages of particular medications. We do appreciate that the state recognized that as an error at the trial level, but we think there are some broader implications in these cases, and we'd ask the court to look into those. And so the two things I'd like to cover this morning in Harlin's case, and then I would refer to Leo's case in the second part of my argument if we get to that. I'd like to cover the voluntary willingness to take medication in Harlin's case, and then secondly, I'd like to cover some other issues that we raised. Is Leo M. docketed for today? No, it's not, but we had asked to consolidate the cases, and there was an order saying that if there was oral argument, they would be assigned to the same panel, and there might be consideration of deciding the two cases together. The same issues that are raised in Leo M. are also raised in Harlin H., except there's one additional issue raised in Harlin H., so it was not exactly clear whether the same panel is deciding those, and so I won't mention Leo M. if you do not want me to. Well, it's not that I don't want you to, it's that I haven't read it, and I'm not familiar with it. I haven't been assigned to it. Unless this panel knows something I don't know, I would look to the presiding justice for the procedure, but I don't think we should be discussing a case that's not docketed for today. That's my own opinion, Justice Bowie. Well, I agree, and obviously we're taking up some of your time, counsel, and we'll allow you to have that back, but in this case, this is what I brought up earlier, and I think we need to look into it. I myself have not read the Leo M. case. I do not know that it's been docketed, so my thought is to not discuss it at this point, and then talk to the clerk after we're done today about how to deal with this case and the Leo M. case, which I'll be glad to do. That's all right. I don't mind having used a little bit of my time to discuss that. I think it's important. I would ask the court to take judicial notice of the separate Leo M. case. It is referenced in this case. You will notice it's referenced in the reply brief in this matter, so turning to Harlan H.'s voluntary willingness to take medication, right out of the gate in Harlan H.'s case, the state asks to add a medication that Harlan is willing to take. It's the Luvox. That's a medication that's an antidepressant. The state says Harlan would like to take this medication, and then there's testimony later from the doctor that Harlan requested to take it because it's a medication that helps him. Then we learn during the proceeding that Harlan has taken medication. He talks about the medications that he's willing to take. This is important because one of the elements of the involuntary medication statute is that the state must prove that there is no less restrictive alternative to forced medication. This court has recently addressed this issue in the Robert M. case. And Harlan's situation is different from Robert M. because Harlan is willing to take medication for his mood disorder, his bipolar disorder. He's willing to take medication for anxiety. He's also asking for a medication for depression. Unlike Robert M., who was only willing to take anti-anxiety medication, Harlan is willing to take medication for all of his issues. Excuse me, Ms. Spahn. Wasn't the evidence, though, that he didn't decide that he would take this until he came to the hearing? I mean, there was some testimony that he wouldn't take his medication as requested, which is what brought this on. Well, Justice Cates, there was evidence. Harlan himself talked about that. He said that he had stopped taking medication for a couple of days. The evidence indicated that there was some kind of a power struggle where he testified that he admitted to that. He said, I did stop taking medication for a couple of days. He said he was put into a seclusion room where he was not even able to plug in his radio. The room did not have an outlet. He was upset about that. He stopped taking medication. Now, I would like to point out that before that, and for all of the years that he has had mental health issues, it appears that he would have been taking medication all of this time in the nearly seven months he'd been at Chester if it hadn't been for the prior petition for involuntary medication. The doctor said, that's right. I don't think he would have been taking medication, but for that prior petition for involuntary medication. I investigated that. I investigated that because in an appeal in the past where there had been allegations of a prior petition, I had been ordered by the appellate court to look into a prior order. That was the Jessica H case. I did. I looked into that. I not only looked into that with Randolph County, I looked into that with Madison County, even though the timing wouldn't have been correct for a 90 day or a 180 day, if there had been a 180 day order with Madison County because he'd been at Chester for nearly seven months. I looked at both counties. Neither county had a petition for involuntary medication. It was in that timeframe. Madison County said they never had a petition for involuntary medication. Randolph County had no petition within that timeframe. I contacted everybody again in the last couple of days just to double check, to make sure, because the state didn't file anything with their brief to contradict what I said or ask the court to take judicial notice or file any kind of supplemental record. Contacting everyone again just to make sure, what I found was that the only known petitions for this gentleman, there had been an involuntary treatment petition, 2015 MH89 from Randolph County for involuntary treatment for this respondent, but it was dismissed. There was no order entered. Then there was this case, 2019 MH36. This is the order that's being appealed right now. Then after this case, there was another petition filed, 2019 MH96, and that petition was dismissed and there was no order entered. This is a person who has a long history of voluntarily taking medication. He went for a couple of days and did not take his medication, and bam, the doctor filed a petition for court-ordered treatment. If you want to look at the bigger the involuntary treatment statute is meant to do, this is what the Illinois Supreme Court CE case says the involuntary treatment statute is not meant to do. What we have here is a person willing to take voluntary medication. This is a case where, according to the Tory G case, we have a person willing to take medication. We can trust his word. He's taken voluntary medication all this time. This would have been a case for a pretrial conference. Let's resolve this case without a court hearing. There's no need for a court hearing in this situation. There's no need for forced order. It's less restrictive to have voluntary treatment in this case. Isn't it true that sometimes during those hearings, a recipient might say, I'm willing to take certain medications, and then the case is dismissed or goes away, and then two days later, they don't take the medications. Therefore, sometimes the doctors ask, if we have an order, that way we can make sure they stay on the course. That may be true. Maybe that's the case, but in a situation like this, why not work out an agreed order then? This case was up for the first time for a hearing. Why not continue the case to see what happens here? There's no need to rush these cases to respond on voluntary medication. There are other alternatives. You have raised an important social justice issue, I think, but I'm not clear what relief this court can give you in that regard. I mean, we can't order a pretrial conference, and we can't order a continuance. I mean, you've raised some really important issues that I think the trial court would be involved with, but I'm just not sure what relief we can give you on that argument. Can you help me with that? Well, this is a compliance issue, I would argue. This is a compliance issue with the element of Section 2107.1 involving the proving less restrictive alternatives to involuntary treatment. This court adopted the Tory G. reasoning in the Robert M. case. Here we have a respondent who the trial court said, this is a person who has a good understanding about medications and is willing to take medication. This is a compliance issue with 2107.1 of the Mental Health Code. And if the state hasn't shown compliance with Section 2107.1, the remedy is reversal here. This is a fundamental liberty issue. The Illinois Supreme Court said in the C.E. case, if each and every element of the statute, we are infringing on a person's liberty interest and violating their due process rights. So we cannot force medication on a person in violation of those rights without showing compliance with every element of the statute. What about the state's argument that there's no reason for us to reach this issue because on remand, it'll be taken care of, so to speak? Well, the Barbara H. case from the Illinois Supreme Court says that these cases are not subject to remand because the orders have already expired. There isn't a remand because there would have to be a new petition. So these cases would just be reversed. And that's the Yes, I misspoke. I meant reversal. So you think that we should address each and every issue so that we make it even more clear to the state what they have to do when they're trying to get involuntary medications administered? Well, I think especially in a case like this, the hearing lasted 17 minutes. There were 16 medications requested. And it's hard to imagine how you can adequately approach a case where you're asking for 16 serious psychotropic medications in a 17-minute hearing. Those 17 minutes, I see my time is up. Is it okay to finish my thought here? As I said, counsel, if I could get the clerk to add about three minutes, I think that's about what we took. That way you can get and talk a little bit about the next issues because those are very important as well. Okay. So I'm kind of turning to my next issue now. We appreciate that the Randolph County cases have been kind of on a continuum. And it used to be that hearings in Randolph County. And in the last decade, there's been improvement with that because they're having hearings now, but the hearings have issues still. I mean, here there was a 17-minute hearing. And that included the state's expert testimony, the respondent's testimony, and the court's ruling, but no closing arguments. There weren't any closing arguments. And it appears the state may be trying to admit the petition into evidence as a way of getting around the compliance issue of presenting evidence on the risks and benefits of the medication, but the petition does not fulfill this requirement. The code requires explicit medical testimony. And if medications are to be administered together in combination, then the benefits and risks of the combination must be presented. And that is this court's HP case. And we know the petition is not evidence. That's from the AW case. And additionally, there are problems with proving capacity when the required written information about the medication is lacking. The written information here that is included in the common law record is like the And this is important because it's a due process requirement before the state can prove that a respondent lacks capacity. Here, the sheets reflected multiple conditions or conditions that the respondent did not have. The sheets did not reflect whether they were primary or alternative medications or if alternatives, what they were alternatives for. They did not contain information about the benefits and risks of the medications if they were going to be administered together in combination. And the petition, if the petition was meant to be used in conjunction with the written information, the petition is not helpful. It broadly discusses two groups of medications, antipsychotic and anxiolytic. But these terms are not cross-referenced on the respondent to have to cross-reference written information with a petition to decipher information provided in medication sheets. And I would just close by saying this court in the past has said that these proceedings should not be conducted pro forma because of the fundamental liberty interests involved in these proceedings. And this court has reminded the parties involved to be ever vigilant to protect the rights of respondents as protected under the mental health code. And that was from the John R case. And I would ask the court to please do that again. The parties are in need of this court's guidance. Thank you. Thank you, counsel. Obviously, you'll be given time for rebuttal. Ms. Shanahan, you ready to proceed? Yes, your honor. Then go right ahead. May it please the court, counsel. My name is Sharon Shanahan and I represent... Hold on one second. Have we lost Justice Barbaras? Yes, we did. He was having some difficulty earlier, so... May it please the court, counsel. My name is Sharon Shanahan and I represent the people of the state of Illinois. I would like to begin my argument by addressing issue, I believe it's four, the confession of error that the state entered. In the petition and in the order both, the requested dosage for lithium was up to the therapeutic level daily. And then the alternative medicine, BPA, also said up to the therapeutic level daily. I have said many times in oral arguments on mental health cases that when I'm arguing a criminal case, I sort of feel like it's us versus them. But in a mental health case, we're all on the same side. We want what's best for these people. And I would not want someone giving me lithium up to the therapeutic level, because what is the therapeutic level? The state agrees with the finding in Bobby F. This is a published opinion by the fifth district. And it was for that reason that the state entered its confession of error on this issue. But since the state conceded this issue, and by the way, there is a misprint that counsel for the respondent did catch on there. This would require a reversal, not a remand. We're not going to go back and have another hearing as to whether Harlan H. should get more medicine. That is just the way these mental health cases work. And so it is a complete reversal. And for that reason, I don't know that there's any reason to address any of these other issues. I've said that repeatedly in my brief. I think it's interesting that I know I am writing briefs and this court in issuing opinions, we always say reverse and remand for further proceedings. There will be no further proceedings in this case. And so it seems to me that given the confession of error in the state's brief, the other issues verge on an advisory opinion. And as Justice Cates says, you know, these are important issues. I do not doubt that at all. And as I said earlier, these involuntary administration of psychotropic medicine should be done properly. But right now, Justice Cates, you said what relief can this court give? And that's kind of my opinion completely. These are issues that need to be fixed, but I think they need to be fixed in the trial court. So that's basically what I want to say is given the confession of error, I see no reason to even address these others. The other thing I want to get onto before addressing the remaining issues is appellate counsel's belief that after a final and appealable order has been entered, that she can go to the Randolph County Courthouse and the Madison County Courthouse and look to see if there's been any issues, I mean, excuse me, any orders entered there, and then come back and respond in an appellate brief and say, I looked, there are none. I mean, I cited a California case in my brief that I always kind of put in in cases like this, which is if it's not in the an entirely different situation. First of all, that was a case where counsel for the respondent had asked to withdraw filing an Anders brief, and the appellate court looked at it and said, and directed counsel, go back and look for this. In this case, first of all, it's certainly not an Anders brief. There's certainly been no request to withdraw from the case. And second of all, no one ordered appellate counsel to go look and see if these were anything, there were any other cases. You can't just take it upon yourself to go look for things that might support your case after a final and appealable order is done. This is something that could have been done at the trial level. This could have been done by knowledge of the respondent. He could have been asked that. This could have been done on cross-examination of the defendant, excuse me, the respondent. This could have been done by a number of ways at trial. Now, the logical jump that I'm sure counsel for the respondent will make on reply is, aha, ineffective assistance of counsel. But you have to have something to base a claim of ineffective assistance of counsel on. And because this was never entered into the record, and the record does indicate at least the testimony of the doctor was listed several places, including another state, Iowa, I believe it was, that he said respondent had been hospitalized in. So I recognize that we're kind of putting respondent in the position of trying to prove a negative, but I strongly object to anything in the brief of saying, after an appealable order was entered, I went and looked for this. Nobody told me to, but I went and looked for it anyway. And the fact that I didn't find it means that it wasn't there. Those are two very separate things. Anything after the appealable order shouldn't be considered. And secondly, to simply say, I looked in two places and I didn't find it, doesn't tell us anything. So what we do have is a respondent's physician who said he had been treating respondent for months. And he said he's had other admissions, he's had other administration of psychotropic medicine. To try and prove anything against that is just simply not, should not be allowed. So I think that part of the brief, that part of the oral argument should be stricken and not considered in any way. Moving on to the more specific issues that remain, other than the COE, as far as respondent's decision to take some, but not all of the medicine, as I believe it was you Justice Boyd said, well, he refused to take his medicine. And that's why this whole thing started. And so what's to stop him from taking it, quitting it, taking it, quitting it, taking it, quitting it. And many of these medicines are the kind of medicines that can have very bad effects if you quit, suddenly quit taking them. And so I think it's important that if we allow a procedure like happened here, where a respondent quits taking his medication and then gets, as a result, there's a hearing and he says at the hearing, oh, I've changed my mind. What's to stop him from then saying the next week, I've just, I've changed my mind again. It simply is not something that should be countenanced. And I recognize that to some extent, well, to a great extent, respondents in all of these mental health cases have the right to make choices about their lives and their bodies. But these are, as a respondent notes repeatedly and properly so, these are medicines that can have side effects. And I think it's important that we have medical professionals deciding, well, if you take this, but not that, you could have a problem. And even within the medications that the respondent said he would take, the documentation included in the record, which by the way, I don't want to run out of time to say this, but the clear distinction between this case and Laura H. is that the documentation and the petition itself were admitted with no objection into the record. So, and in Laura H., they were not. Can I ask a question in regard to Ms. Spann's suggestion that there were 16 medications requested in a 17-minute hearing? Would you like to address that in terms of, was that sufficient time to cover all the information that seems like it would be necessary to issue an order revolving around 16 medications? Well, I think that would have to presume that when everybody walked into that courtroom that day, they knew nothing. I think that's akin to saying, we have 10 minutes, or I have 15 minutes, I guess, to discuss with you a brief that I wrote, spent days writing. You come to a hearing prepared. The court came to the hearing prepared. Presumably, the state's attorney came to the hearing prepared. It wasn't a cold field. It was my, not a matter of, you want me to take risperidone? I had no idea. Well, for the record, though, in these cases, isn't the state required to make sure that the respondent knows what the medications are, the side effects, and the benefits of each on the record, not just from past knowledge? I believe, and quite honestly, I will readily concede to Ms. Spahn, who has far more knowledge of the mental health statutes than I do, but I believe that the respondents have to be given notice in writing of the benefits and the side effects. And your brief addresses that. Yes. And in fact, it even says that the physician or, again, I'm forgetting the exact language, but someone designated by the physician has to give these documents. And if the respondent is unable to read them themselves, then read them to them. And the record clearly shows that that's exactly what happened here, that a registered nurse, on behalf of the doctor, gave the respondent all of these documents. And it, again, on the record, says that she read them to him. And I believe that there is case law that says simply telling the person is not good enough. You have to give it to them in writing. And so I hope that answers your question. Thank you. Any other questions? I guess I would like to briefly move on to whether he received, well, very briefly, because I think we touched on this just now, Justice Barberos, of whether he received written notices. I said we have the record indicating that the nurse reviewed the documents with the admitting the petition into evidence. Respondent tried to distinguish A.W. because it said that the petition could be admitted into evidence for dosages. And she's saying, well, our case is not dosages. It's whether the benefits and side effects. But I think this is looking for the minutiae instead of looking at the purpose behind that, which is if a document can be admitted either through judicial notice or through being admitted into evidence, then the document can be admitted for what it says. And one of the things it might say is dosages. I mean, one of the things it does say is dosages. But one of the things that it also said in this case was the benefits and side effects. So I don't think that A.W. can be limited to the conclusion that you can only admit the petition to look at dosages. I think if the petition is admitted, then it can be considered by the trial court for anything that is set forth there. And as I said, the documents here were admitted without objection. And this, I think, even goes back to your initial question, which is, can we consider, well, I looked at the clock and then I forgot my train of thought. So I guess I will, unless there are other questions. Thank you. Respond? Rebuttal? Yes, thank you. I would like to say that the state talks about how it's also on the respondent's side. I think that's true. The state has an obligation to look out for all the people. It's not just presenting a petition for involuntary admission in these proceedings, but the state has an obligation to protect the respondent too. And yes, I think the same is true at the appellate level. And so, as I said in my opening argument here, we appreciate that the state confessed error as to the dosages. But when the state says there's no reason to address the other issues, I disagree with that. I disagree with the idea of an advisory opinion because the state says there are important issues here. They need to be fixed, but they need to be fixed in the trial court. They're not going to be fixed in the trial court unless the trial court gets some guidance. These same errors are going to keep occurring. And that's why I do ask this court to please take judicial notice of the concurrent Leo M case. If this court reads the transcript, it will see the same exact script. It will see the same question asked of the doctor, but for a prior order, would Leo M have been taking medication up to this point? The doctor answers the question the same way he did in Harlan's case. And the state raised this issue. The state raised this issue at the trial level of there being a prior order. And the doctor just went along with it. The doctor maybe was a deer caught in the headlights and didn't know the answer and so answered the way the state thought it should be answered. It was a leading question. And so the doctor said, well, no, I don't think Harlan would have been taking medication except for that prior petition. And that means an immediately prior petition. There was not one. That's why I investigated, because it's relevant. It's relevant to his voluntariness. And that's why it's important to this court. The state brought that up at the trial level. And the state was asking the court, do you think Harlan H. was taking medication? But the state apparently didn't know the answer. And the doctor answered incorrectly. So that's very relevant here. And for the state to say now that I have no business bringing that up at this level, I think is very wrong. And it's perpetuating the falseness of this idea that Harlan H. was only taking medication pursuant to a court order that we know doesn't exist. If the state felt that I'm making a false statement to the court at this point, the state could certainly provide a copy of that court order requiring Harlan H. to take I would ask the court to take judicial notice. But there is no such order that required Harlan H. to take involuntary medication. He was taking medication voluntarily. He's had a mental illness for a long time. He's had bipolar disorder. He took medication voluntarily. There is reason to address these various issues raised in his appeal. It is to give guidance to the trial court. And I would ask the justices to note now that Harlan H. has had more time in this court than he had at the trial level. I'd also like to take, I don't know, I was going to read from a transcript from the Tory G case about olanzapine, just about the testimony about one medication, but I'm not going to have time for it because it was over a minute to talk about just one, to read the doctor's testimony about one medication, about the benefits and risks. Now, if you give testimony about the Harlan's case, there's not time for that in a 17-minute hearing, plus cover all of the other elements of 2107.1. That's what's happening in Randolph County. I would ask the court to please consider the issues in this case, compare this case with the companion Leo M case, and please look at these issues and reverse, not just on the narrow issue of the dosages, but to look at these other issues to see that they're happening in not just an isolated case, but they're happening in more than one case. They're happening on a regular basis. They're happening as a regular practice. Thank you. Thank you, counsel. I do have a question. It was touched upon, but really didn't go into too much detail, and I know, Ms. Bond, with the GAC, you're involved throughout the state. The issue regarding some sort of written documentation to be given to a recipient regarding the combination and the polypharmacy and the interactions of different medications. Do you know, is there any type of document such as that that is being used anywhere else or anywhere in the state in these types of hearings? I think that would be a document that would be tailored to the situation. There's not one standard form because we don't know what medications would be used in combination for a particular person. That's going to have to be tailored to the person and the medications used in combination. Following that, then, basically, the natural progression would be that the particular doctor in that particular case would have to generate some sort of document himself or herself to list the medications and how they interact for that particular person in that particular case. Is that kind of what I'm hearing? That's what I would think, and I think that's what the code envisions, too, that you want to make this so that the information is pertinent to the particular respondent. I get that. The code basically states, and that's 2-102A5 I'm looking at here. The code provides that a physician shall advise the recipient in writing of the side effects, risks, and benefits of the treatment as well as alternatives to the proposed treatment to the extent such advice is consistent with the recipient's ability to understand the treatment. It doesn't say the combination of certain things. It says risk, benefits, side effects. Correct? This is also pursuant to this court's HP case, which talks about the concerns with giving medication in combination with each other because doctors do testify about how each medication has its own side effects and risks. Oftentimes, like with Harlan H., you have medications from various different groups. There are antipsychotics, there are mood stabilizers, anti-anxiety medications. That wasn't even discussed here in this case. I know about these from medication cases where the psychiatrists have talked about all the different medications and explained them. If medications are given, like you have an antipsychotic, you maybe have a mood stabilizer, you have an anti-anxiety, and they're all used in combination, then when those medications are used in combination, then there are additional side effects on top of the individual side effects from using all of those together. No doubt. You cited the case that addresses that and states that the expert must testify to those side effects of the combination of those medications, correct? Right. That's something else that the respondent needs to be aware of. When providing information about side effects of the medications, that's information that the respondent also needs to know in deciding what medications to be able to consent to or not in making a reasoned decision. They need to know if there are additional side effects when taking these medications together. Just as somebody with any other type of medical condition being offered multiple medications needs to know all the information about medications individually, about how they're going to affect him taking them together, how those would affect his health. Okay. Justin, do you have any follow-up questions of anything that I've asked? No. All right. Thank you, counsel. Obviously, we will take this under advisement and issue a disposition of due course. You all have a great day. Thank you, your honor.